*1003 TEXTO COMPLETO DE LA SENTENCIA
Comparece ante nos la Universidad de Puerto Rico, Recinto de Humacao (UPRH), mediante recurso de apelación presentado el 13 de febrero de 2006. Solicita la revocación de la Sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de Humacao (TPI), el 5 de octubre de 2005, notificada y archivada en autos el 19 de octubre de 2005. El TPI declaró “ha lugar” la demanda sobre discrimen y represalias presentada por Nydia Lebrón Amaro (Lebrón) y le concedió cuarenta mil dólares ($40,000), que representaban el doble de la compensación de veinte mil dólares ($20,000) fijados por los daños sufridos como consecuencia de la conducta hostigante observada por el co-demandando Nelson Santos Alamo (Santos). Además, declaró “ha lugar” la demanda en cuanto a la co-demandada UPRH por ser el patrono co-responsable de la conducta de su empleado, conforme el Artículo 1803 del Código Civil de Puerto Rico, 31 L.P.R.A. see. 5142. Finalmente, el TPI condenó a Santos y a la UPRH al pago de tres mil dólares ($3,000) por concepto de honorarios de abogado, más dos punto cinco por ciento (2.5%) de interés anual. Por otra parte, desestimó la causa de acción en cuanto a los co-demandados Dra. Hilda Colón Plumey, Luis Lizardi y la Dra. Francisca Rodríguez.
A continuación expondremos el trasfondo fáctico y procesal del caso.
I
El 12 de marzo de 2001, Lebrón comenzó a trabajar en la UPRH como Secretaria Administrativa I, mediante un contrato de servicios cuya vigencia se extendía hasta el 30 de junio de 2001. En ese momento, fue asignada a trabajar a la Oficina de Cobros y. Reclamaciones en donde su supervisor inmediato era Santos. La UPRH renovó el contrato de Lebrón para los períodos del 1ro de julio de 2001 hasta el 30 de junio 2002 y del 1ro de julio de 2002 hasta el 30 de junio de 2003.
El 9 de julio de 2002, Lebrón presentó querella por hostigamiento sexual en contra de Santos ante la Oficina de Recurso Humanos de la UPRH. En ésta, alegó que hacía aproximadamente un año que estaba siendo hostigada, amenazada, manipulada e intimidada por la conducta de Santos en el trabajo.
Por motivo de la querella, la Oficina de Recursos Humanos inició una investigación informal y rindió un informe el 12 de julio de 2002. Como medida provisional, el entonces Rector Interino de la UPRH, Ledo. Enrique Alvarado, reubicó temporeramente a Lebrón en la Oficina de Finanzas y designó a una Oficial Investigadora en el caso.
Posteriormente, el 25 de octubre de 2002, la Oficial Investigadora rindió su informe. Como parte de la investigación entrevistó a Lebrón, a Santos y a otros empleados que tenían conocimiento personal de los hechos. De acuerdo al informe, del testimonio de Lebrón surgía con claridad que Santos había incidido en actos y/o conducta constitutiva de hostigamiento sexual hacia ella. Dicho testimonio reveló lo siguiente:

“Su relación con la Querellante estableció un patrón de avances y requerimientos de favores sexuales, los cuales no eran deseados por la querellante. Su conducta verbal o física era de naturaleza sexual y se exhibió cada vez que le hablaba de sus ‘labios carnosos y bonitos ’, de querer tener hijos con ella, sus insinuaciones de que la Sra. Lebrón ‘lo ponía malito’, sus roces de piernas, sus requerimientos de que se quedara a trabajar más allá de las 4:30 P.M., su desagrado visible ante otros empleados si la Sra. Lebrón se iba a almorzar con otros compañeros, su obstinada conducta de evitar que la Sra. Lebrón saliera de la Oficina llevándole comida, golosinas, su vigilancia y observancia obsesiva sobre la Sra. Lebrón, sus llamadas y visitas a la residencia de 
*1004
la Sra. Lebrón, su insistencia de almorzar siempre con él, su insistencia de que fueran juntos a paradores, el ofrecimiento de que ella aceptara una Guagua Vitara. La querellante Sra. Lebrón Amaro testificó y las personas entrevistadas corroboraron que el querellado le hacía comentarios sobre sus atributos físicos, que le llamaba ‘la o mi negrita’, que el querellado le expresó conversaciones cargadas de alto contenido sexual, (‘tus labios carnosos, tus dos razones refiriéndose a sus senos, ‘me voy porque me pones malitoj que le inquiría aspectos íntimos de su vida privada y personal y que la rozaba con las piernas y le apretó y agarró sus manos. Los testigos corroboraron que:

- el Querellado compró neveras y otros equipos, junto a comida y golosinas para ‘la negrita’, como le llamaba ante otros compañeros.

- Que la seguía a todas parte y nunca la dejaba sola haciendo su trabajo.

- Que la hacia trabajar después de horas laborables.

- Que hablaba mal de ella a las otras compañeras para indisponerlas con ella.

- Que la observaban asustada, temerosa y muchas veces llorando. ”

Según la Oficial Investigadora, la conducta de Santos “rebasó los límites permitidos entre una adecuada supervisión y excedió los parámetros razonablemente permitidos en una relación Supervisor-Supervisada”. Dicha conducta creó un ambiente de trabajo “asfixiante, agobiante y hostil” que interfirió razonablemente en el desempeño laboral de Lebrón.
A base de lo anterior, recomendó que se formularan cargos disciplinarios en contra de Santos, en virtud del Artículo 39, secciones 39.2.5, 39.2.8 y 39.2.19 del Reglamento General de la Universidad de Puerto Rico. Eventualmente, se presentaron cargos por hostigamiento sexual en contra de Santos; no obstante, éste llegó a un acuerdo con la UPRH mediante el cual negoció una suspensión de empleo y sueldo como medida disciplinaria. 
El 22 de septiembre de 2003, Lebrón presentó demanda sobre discrimen por razón de género y daños y perjuicios en contra de la UPRH, la Dra. Hilda Colón Plumey, Santos,' Luis Lizardi y la Dra. Francisca Rodríguez. En ésta, alegó que desde febrero de 2001 hasta el año 2003 fue objeto de “un patrón sistemático de avances y requerimientos de índole sexual ” por parte de Santos, lo cual creó un ambiente hostil, intimidante y ofensivo en el área de trabajo. Adujo que le notificó al supervisor de Santos, Luis Lizardi, sobre esta situación; sin embargo, éste no tomó las medidas correctivas necesarias.
Según Lebrón, una vez denunció los incidentes de hostigamiento sexual comenzó un patrón de discrimen en el empleo en su contra, pues la relocalizaron en otros departamentos. El 14 de octubre de 2002, fue trasladada al Departamento de Terapia Ocupacional para cubrir a una empleada que se encontraba en licencia por maternidad. En abril de 2003, fue reubicada en la Oficina de Recursos Humanos en donde estuvo rindiendo labores por aproximadamente dos (2) meses. El 30 de junio de 2003, vencido el contrato de servicios, la entonces Rectora de la UPRH, la Dra. Hilda Colón Plumey, le extendió el nombramiento a Lebrón desde el 1ro. de julio de 2003 hasta el 30 de octubre de 2003 y la asignó al Departamento de Enfermería. Las tareas que se le asignaban en estas dependencias eran distintas a las que realizaba como Secretaria Administrativa I.
Alegadamente, toda esta situación produjo que Lebrón tuviera que ser sometida a tratamiento médico, pues desarrolló una condición de depresión por causa del ambiente hostil creado por los co-demandados. Por ello, reclamó una indemnización al amparo de la Ley Núm. 100 de 3 de junio de 1959, 29 L.P.R.A. see. 146 et seq., sobre discrimen en el empleo y la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, 29 LPRA see. 185 *1005 et seq., sobre indemnización por despido injustificado.
El 6 de mayo de 2004, Lebrón enmendó la demanda para incluir como parte de las alegaciones que no se le había renovado el contrato de servicios el 31 de octubre de 2003, fecha en que venció la última extensión del mismo, como represalia por haber instado la causa de acción en contra de la UPRH.
El 9 de diciembre de 2004, la parte demandada presentó Moción de Desestimación y Sentencia Sumaria. Mediante la misma, solicitó que se desestimaran las reclamaciones instadas bajo la Ley Núm. 100, supra, y la Ley Núm. 80, supra, pues ambas disposiciones no le aplicaban a la UPRH por ser una instrumentalidad del Estado Libre Asociado que no operaba como un negocio o empresa privada. De otra parte, sostuvo que la demanda estaba prescrita, pues desde el 9 de julio de 2002, la UPRH reubicó a Lebrón en otro Departamento en donde ya no tenía contacto con Santos. Sostuvo que a partir de esa fecha comenzó a transcurrir el término prescriptivo de un año que tenía Lebrón para instar su causa de acción y que ésta presentó la demanda transcurrido un año y dos meses.
El 20 de diciembre de 2004, notificada el 12 de enero de 2005, el TPI emitió Sentencia Parcial Desestimatoria en la que desestimó la causa de acción instada en contra de la UPRH bajo la Ley Núm. 100, supra, y la Ley Núm. 80, supra, por no ser un patrono de acuerdo a la ley. Además, le concedió un término de treinta (30) días a Lebrón para enmendar las alegaciones para conformar las mismas de acuerdo a la Ley Núm. 69 de 6 de julio de 1985, 29 L.P.R.A. see. 1321, sobre discrimen por razón de género y a la Ley Núm. 17 de 22 de abril de 1988, 29 L.P.R.A. see. 155 et. seq, conocida como la Ley de Hostigamiento Sexual en el Empleo.
El 26 de enero de 2005, Lebrón presentó Segunda Demanda Enmendada a los únicos fines de alegar la aplicación de la Ley Núm. 69, supra, y la Ley Núm. 115 de 20 de diciembre de 1991, 31 L.P.R.A. see. 194 et seq., sobre represalias.
El 12 de abril de 2005 y el 10 de junio de 2005, el TPI celebró juicio en su fondo en el caso.
Posteriormente, el 5 de octubre de 2005, notificada el 19 de octubre de 2005, el TPI emitió Sentencia en la que declaró “ha lugar” la demanda presentada por Lebrón. El referido foro concluyó que la no renovación del contrato de Lebrón fue en represalia por haber presentado ante la UPRH la querella por hostigamiento sexual el 9 de julio de 2002 y la demanda el 22 de septiembre de 2003, un mes antes de que venciera el contrato. El TPI le concedió a Lebrón la cantidad de cuarenta mil dólares ($40,000), que representaba el doble de la compensación de veinte mil dólares ($20,000) fijados por los daños y angustias mentales sufridos por la conducta hostigante que observó el co-demandando Santos hacía ella. También declaró “ha lugar” la demanda en cuanto a la co-demandada UPRH por ser co-responsable por la conducta de su empleado, al amparo del Artículo 1803 del Código Civil de Puerto Rico, 31 L.P.R.A. see. 5142. Además, condenó a Santos y a la UPRH al pago de tres mil dólares ($3,000) por concepto de honorarios de abogado, más dos punto cinco por ciento (2.5%) de interés anual. Por otra parte, desestimó la causa de acción en cuanto a los co-demandados Dra. Hilda Colón Plumey, Luis Lizardi y la Dra. Francisca Rodríguez. Oportunamente, el 2 de noviembre de 2005, Lebrón presentó Moción de Reconsideración. Mediante la misma, solicitó al TPI que ordenara el pago del doble de los ingresos dejados de devengar, más su restitución en el empleo.
Posteriormente, el 8 de noviembre de 2005, notificada el 23 de noviembre de 2005, el TPI emitió Orden en la que le ordenó a la parte demandada que replicara a la moción de reconsideración dentro del término de veinte (20) días.
En cumplimiento de lo ordenado, el 27 de noviembre de 2005, la parte demandada presentó Oposición A Moción De Reconsideración.
*1006 El 30 de diciembre de 2005, notificada el 12 de enero de 2006, el TPI emitió Orden en la que declaró ‘‘no ha lugar” la moción de reconsideración presentada por Lebrón.
El 13 de febrero de 2006, la UPRH presentó recurso de apelación en el que señaló la comisión de los siguientes errores:

“1. Incidió el Honorable Tribunal al forzar a los apelantes a comparecer a la vista en su fondo sin estar preparados.

2. Incidió el Honorable Tribunal al declarar con lugar la demanda a tenor con la Ley Núm. 69 del 6 de julio de 1985, 29 L.P.R.A. see. 1321 y siguientes.

3. Incidió el Honorable Tribunal al no resolver que la demanda estaba prescrita.

4. Incidió el Honorable Tribunal al determinar que los apelados infringieron las disposiciones de la Ley de Represalias, Ley Núm. 115.

5. Incidió el Honorable Tribunal de Primera Instancia en la apreciación de la prueba. ”

II
La Constitución del Estado Libre Asociado en su Carta de Derechos, Art. II, 1 L.P.R.A. sec. 1, establece que la dignidad del ser humano es inviolable y que todas las personas son iguales ante la ley. Se consagra como principio fundamental, el derecho de toda persona a la protección contra ataques abusivos a su honra, reputación y vida privada o familiar. Art. II, I L.P.R.A. see. 8; Rodríguez Meléndez v. Supermercados Amigo, Inc., 126 D.P.R. 117, 124 (1990). Para poner en vigor dicho mandato constitucional, se ha legislado para proveer a los empleados los recursos necesarios para protegerlos de prácticas discriminatorias en el empleo. Entre esa legislación se encuentra la Ley Núm. 17 de 22 de abril de 1988, 29 L.P.R.A. 155 et. seq., la cual como parte de su política pública prohíbe el hostigamiento sexual en el empleo e impone penalidades a quienes cometan o permitan tal conducta. La Exposición de Motivos de dicha ley establece que “[l]a práctica del hostigamiento sexual en el empleo, en cualquiera de sus formas, infringe la inviolabilidad del ser humano y constituye un claro discrimen contra el hombre o la mujer en el campo del trabajo. ”
El Artículo 1 de esa ley dispone que el hostigamiento sexual en el empleo constituye una forma de discrimen por razón de sexo y, como tal, constituye una práctica ilegal e indeseable que atenta contra el principio constitucional de que la dignidad del ser humano es inviolable. 29 L.P.R.A. see. 155. 
En específico, el Artículo 3 de la Ley Núm. 17, supra, 29 L.P.R.A. sec. 155b, define el hostigamiento sexual en el empleo de la siguiente manera:

El hostigamiento sexual en el empleo consiste en cualquier tipo de acercamiento sexual no deseado, requerimientos de favores sexuales y cualquier otra conducta verbal o física de naturaleza sexual, cuando se da una o más de las siguientes circunstancias:

a. Cuando el someterse a dicha conducta se convierte de forma implícita o explícita en un término o condición del empleo de una persona.

b. Cuando el sometimiento o rechazo a dicha conducta por parte de la persona se convierte en fundamento para la toma de decisiones en el empleo o respecto del empleo que afectan a esa persona.

c. Cuando esa conducta tiene el efecto o propósito de interferir de manera irrazonable con el desempeño *1007 del trabajo de una persona o cuando crea un ambiente de trabajo intimidante, hostil u ofensivo. ” (Cita omitida).
Los incisos (a) y (b) de este artículo se refieren al tipo de hostigamiento sexual conocido como quid pro quo, mediante el cual el hostigador condiciona las oportunidades y los beneficios del empleado a cambio de favores sexuales. Por lo tanto, el empleado afectado y el hostigador pertenecen a distintos niveles en la jerarquía de la empresa.
Por otro lado, el inciso (c) se refiere al hostigamiento sexual que se configura cuando la conducta sexual dirigida hacia un individuo tiene el efecto de interferir irrazonablemente con el desempeño de su trabajo o de crear en el mismo un ambiente de trabajo que resulta intimidante, hostil u ofensivo. Rodríguez Meléndez v. Supermercados Amigo, Inc., supra, a las páginas 131-132. Ello ocurre independientemente de que no exista menoscabo económico de la alegada víctima o de que la conducta no sea explícitamente sexual. Basta que la conducta que se imputa como constitutiva de hostigamiento, se origine por razón del sexo de la persona y que la misma cree unas circunstancias en el empleo que alteren significativamente las condiciones de trabajo. In re: Robles Sanabria, 151 D.P.R. 483, 499-500 (2000).
El hostigamiento sexual puede expresarse en diversas formas: 1) manifestaciones simples como piropos, guiñadas e insinuaciones sexuales indeseadas; 2) expresiones de agresión sexual más directas y más violentas como frases de cariño no invitadas, pellizcos, roces corporales no solicitados, invitaciones insistentes a salidas que no se desean, besos, abrazos y apretones forzados; 3) casos extremos de violencia física y psíquica, que incluye la violación sexual. Sánchez v. A.E.E., 142 D.P.R. 880, 884 (1997), Opinión concurrente del Juez Asociado Negrón García.
Para establecer un caso prima facie de hostigamiento sexual por ambiente hostil, la parte promo vente de la acción “debe probar que ha ocurrido más de un incidente de conducta sexual ofensiva”. Id. “Un acto aislado o un mero ‘piropo ’, aunque pudiera ser no deseado, no origina una causa de acción bajo esta modalidad. ” Id.
Bajo esta modalidad “[e]s preciso demostrar que la conducta desplegada hacia la alegada víctima por razón de su sexo crea una atmósfera hostil, ... por razón de su sexo, [que] interfiere de forma irrazonable con el sano desempeño de su trabajo. ” Id.
La determinación de si un ambiente de trabajo es hostil o no, se debe hacer a base de la totalidad de las circunstancias de cada caso en particular. 29 L.P.R.A. sec. 155c; Delgado Zayas v. Hospital, 137 D.P.R. 643, 654-655 (1994). Se deben considerar factores como la naturaleza de la conducta, la frecuencia e intensidad de la misma, el contexto en el cual ocurre, tiempo de duración y las circunstancias personales del demandante. Rodríguez Meléndez v. Supermercados Amigo, Inc., supra, a página 132. El ambiente hostil perdurará durante el tiempo que estén presentes las condiciones que lo causan. Sánchez v. A.E.E., supra, a la página 885. “Entre las causas que crean un ambiente hostil se encuentran: (1) conducta de hostigamiento sexual; (2) omisión del patrono de prevenir, desalentar y evitar dicha conducta; y (3) omisión del patrono de atender adecuadamente la querella de un empleado. ” Id., a la página 885, nota al calce núm. 8.
El Artículo 14 de la Ley Núm. 17, supra, 29 L.P.R.A. sec. 115m, establece el término prescriptivo para la presentación de reclamaciones de esta índole. A tal efecto, dispone que la persona agraviada tendrá un año para ejercer su derecho de reclamar indemnización por los daños sufridos. Maldonado Vega v. Russe Santiago, 153 D.P.R. 342, 351-352 (2001); Suárez Ruiz v. Figueroa Colón, 145 D.P.R. 142, 149-150 (1998). Para fines del cómputo de dicho término, la referida disposición estatutaria establece que el mismo comienza a decursar “cuando se terminan las circunstancias que podrían entorpecer el ejercicio de la acción. ”
En el caso de la modalidad de hostigamiento sexual por ambiente hostil, ésta se distingue por la *1008 multiplicidad de incidentes. In re: Robles Sanabria, supra, a la página 500. De ahí que el término prescriptivo en este tipo de casos comience a decursar tan pronto cesa el ambiente hostil, esto es, desde que desaparecen las circunstancias que crean un ambiente abusivo para el empleado.
En Suárez Ruiz v. Figueroa Colón, supra, el Tribunal Supremo concluyó que la celebración de un proceso investigativo interno del patrono para dilucidar quejas por hostigamiento sexual, no paraliza el término prescriptivo para instar una acción bajo la Ley Núm. 17, supra, por no existir identidad de propósito entre la acción judicial y el proceso investigativo. Véase, además, Maldonado Vega v. Russe Santiago, supra, a las páginas 353-354. Al respecto, indicó: “No podemos atribuirle a una investigación interna realizada por un patrono en el centro de trabajo el mismo carácter que a un procedimiento instado ante las agencias administrativas encargadas del procedimiento de cargos por discrimen en el empleo a nivel estatal y federal (es decir, ante la Unidad Antidiscrimen del Departamento del Trabajo y Recursos Humanos o ante la Oficina Federal de Igualdad de Oportunidades en el Empleo). ” Suárez Ruiz v. Figueroa Colón, supra, a la página 154. Dicho foro explicó que “entre un procedimiento interno creado por el patrono para atender quejas y una acción por hostigamiento sexual no hay identidad de propósitos; por lo tanto no opera la congelación del termino prescriptivo”. Id., a la página 156.
No obstante, si la notificación de la querella que se radica en virtud de un procedimiento intemo cumple con los requisitos de una reclamación extrajudicial, el término prescriptivo para radicar la correspondiente acción judicial quedara interrumpido. Suárez Ruiz v. Figueroa Colón, supra, a la página 156. En estas situaciones el término prescriptivo no queda congelado por el tiempo que duren los procedimientos intemos, sino que la presentación de la querella tiene el efecto de interrumpir instantáneamente la prescripción, comenzando a correr el término nuevamente. Maldonado Vega v. Russe Santiago, supra, a la página 354. Esto a diferencia de aquellos casos donde el trámite intemo o administrativo guarda identidad de propósitos con la acción judicial, situaciones en las cuales el término queda congelado hasta tanto culmine todo el proceso. Id.
III
En su primer señalamiento de error, la UPRH alegó que el TPI incidió al forzarle a comparecer a la vista en su fondo sin estar preparados.
La UPRH sostuvo que no hubo un señalamiento por escrito en el cual se indicara libre de toda ambigüedad que en efecto el 12 de abril de 2005 se estaría celebrando una vista en su fondo. Explicó que durante la vista en cámara celebrada en diciembre de 2004, se indicó que si no se adjudicaban todas las controversias entre las partes entonces en abril se estaría celebrando una vista argumentativa. Expuso que aún en este caso quedaba pendiente por resolver la defensa de prescripción planteada en la moción de sentencia sumaria, pues nunca fue adjudicada por el tribunal.
De otra parte, la UPRH señaló que durante la vista celebrada el 12 de abril, Lebrón presentó toda su prueba documental. Alegó que al forzar la celebración de dicha vista, se limitó su capacidad de contrainterrogar y defenderse de toda la pmeba desfilada por la parte demandante.
En su escrito, Lebrón señaló que el juicio en este caso había sido señalado para el 20 de diciembre de 2004. No obstante, el 9 de diciembre de 2004, a sólo once (11) días antes de la vista, la UPRH presentó una moción de desestimación la cual no pudo contestar, por lo que se reseñaló el juicio para el 12 de abril de 2005. Alegó que dicho señalamiento se hizo en corte abierta y, además, el tribunal le dio la oportunidad a la UPRH de presentar sus testigos en la continuación de la vista el 10 de junio de 2005.
De la transcripción de la vista, surge que en efecto la UPRH alegó ante el TPI que aún estaba pendiente por resolver la defensa de prescripción, por lo que entendía que ese día habría de celebrarse una vista argumentativa. Por su parte, el TPI hizo referencia a la Minuta de la vista celebrada en diciembre de 2004 en la *1009 que dicho foro dispuso que se proponía continuar con el caso, una vez Lebrón enmendara las alegaciones de la demanda bajo la Ley Núm. 69, supra, y la Ley Núm. 17, supra. Por consiguiente, señaló “juicio en su fondo y/o vista argumentativa para el 12 de abril”. Aclaró el TPI que la parte demandante y los respectivos abogados quedaron notificados en corte abierta. 
Por otra parte, del expediente surge que el 2 de febrero de 2005, notificada el 16 de febrero de 2005, el TPI emitió Orden con relación a la Contestación a Segunda Demanda Enmendada en la que dispuso: “ENTERADO Y RECALCÁNDOSE A LAS PARTES SOBRE LA VISTA DEL 12 DE ABRIL.” 
En el presente caso, al señalarse la vista para el 12 de abril se les advirtió a los representantes legales de las partes en corte abierta que en esa fecha se estaría celebrado el juicio en su fondo y/o vista argumentativa. Siendo ello así, los abogados estaban enterados de que el TPI ese día estaría celebrando cualquiera de las referidas vistas o ambas, por lo que debían haber estado preparados, como fue el caso de la parte demandante. Ello así, concluimos que el primer error alegado no se cometió.
IV
Como segundo error, la UPRH señaló que el TPI incidió al declarar con lugar la demanda a tenor con la Ley Núm. 69, supra. Sostuvo que dicha ley no es de aplicación a situaciones de hostigamiento sexual. Planteó que tanto el testimonio de Lebrón como la prueba desfilada en el juicio estuvieron dirigidos a demostrar unas alegaciones bajo la Ley Núm. 17, supra, la cual protege a los trabajadores contra el hostigamiento sexual. Añadió, que Lebrón omitió hacer referencia a Ley Núm. 17, supra, en la segunda demanda enmendada, pues pretendía obviar la defensa de prescripción levantada en la moción de sentencia sumaria que presentó la parte demandada.
La Ley Núm. 69 de 6 de julio de 1985, 29 L.P.R.A. see. 1321 et seq., prohíbe el discrimen por género en el área de trabajo. Además, define lo que ha de considerarse represalia en el ambiente laboral y provee para la indemnización al empleado perjudicado por tales actuaciones. El Artículo 20 de esta ley, 29 L.P.R.A. see. 1340, dispone que: “[s]erá práctica ilegal del trabajo que el patrono, organización obrera o comité conjunto obrero-patronal que controle programas de aprendizaje, adiestramiento o readiestramiento, incluyendo programas de adiestramiento en el empleo, despida o discrimine contra cualquier empleado o participante que presente una querella o que se oponga a prácticas discriminatorias o que participe en una investigación o proceso contra el patrono, organización obrera o comité conjunto obrero-patronal por prácticas discriminatorias”.
Según ya indicáramos, la Ley Núm. 17, supra, regula específicamente el hostigamiento sexual en el empleo, proveyendo un remedio civil a las personas así perjudicadas.
De la Segunda Demanda Enmendada que presentó Lebrón, surge que ésta solicitó los remedios que proveen la Ley Núm. 69, supra, y la Ley Núm. 115 del 20 de diciembre de 1991, 29 L.P.R.A. see. 194, et seq. Esta última le reconoce a todo empleado el derecho a no ser discriminado por su patrono como represalias por ofrecer testimonio o información ante un foro legislativo, administrativo o judicial en Puerto Rico.
En sus conclusiones de derecho, el TPI hizo referencia a las disposiciones de la Ley Núm. 69, supra, como uno de los fundamentos para el dictamen.
Ciertamente, por tratarse de un caso de hostigamiento sexual, la ley que aplicaba era la Ley Núm. 17, supra. Inclusive, las partes estipularon durante la vista en su fondo que en efecto hubo actos de hostigamiento sexual en contra de Lebrón. A base de lo anterior, concluimos que el segundo error alegado se cometió.
V
En su tercer error, la UPRH adujo que el TPI incidió al no resolver que la demanda presentada por Lebrón *1010 estaba prescrita. Señaló que del testimonio de Lebrón y de la prueba documental surgía que el 9 de julio de 2002, ella fue reubicada del área de trabajo donde laboraba Santos, por lo que a partir de esa fecha terminaron las circunstancias que podía entorpecer la acción judicial. Por consiguiente, alegó que a partir de ese momento comenzó a decursar el término prescriptivo de un año para que Lebrón presentara la demanda. De otra parte, la UPRH indicó que aunque Lebrón declaró que con posterioridad al 9 de julio de 2002, Santos la seguía al estacionamiento, cuando salía del trabajo y durante la hora de almuerzo. Ella no registró estos eventos en el narrativo en el cual hacía un recuento de todos los actos de hostigamiento alegadamente cometidos por su supervisor, como hizo con el resto de los incidentes de hostigamiento sexual.
El término prescriptivo de las acciones instadas a tenor de la Ley Núm. 17, supra, es el de un (1) año. Dicho término comienza a decursar tan pronto cesa el ambiente hostil, es decir, desde que desaparecen las circunstancias que podrían entorpecer el ejercicio de la acción.
Conforme a los hechos del caso, el 9 de julio de 2002, Lebrón presentó querella por hostigamiento sexual ante la UPRH, pues hacía aproximadamente un año que estaba siendo hostigada sexualmente por Santos, quien era su supervisor en la Oficina de Cobros y Reclamaciones. En esa misma fecha, la UPRH tomó la decisión de reubicar a Lebrón en la Oficina de Finanzas como medida preventiva.
Transcurridos un año y dos meses de haber presentado la querella, específicamente el 22 de septiembre de 2003, Lebrón presentó demanda por hostigamiento sexual por ambiente hostil y represalias. En la misma, expuso que desde febrero de 2001 hasta el año 2003 [10] había sido objeto de “un patrón sistemático de avances y requerimientos de índole sexual” por parte de Santos.
Durante la vista, Lebrón declaró que Santos continuó hostigándola hasta octubre de 2003. Sobre el particular, testificó lo siguiente:

“P. ...¿ Ya dónde las enviaron?

R. Me enviaron a Finanzas, fue la primera oficina que me movieron.

P. Con relación a ese diagrama ahí, finanzas estaba ahí en esa área.

R. En otro edificio.

P. ¿ Y entonces ahí como el señor Santos era la comunicación con usted, si había alguna?

R. .. .para Finanzas, si nos encontrábamos en el pasillo, él se me quedaba mirando y yo pues, le cambiaba la cara y seguía. En una ocasión fui, iba para mi carro, en vez de él..., porque la oficina de Finanzas, al fondo, hay dos parking, uno al extremo, el otro al otro extremo. En varias ocasiones, él cuando era la hora de salida de mi trabajo, él pasaba por donde yo estaba saliendo.

P. ¿Y él tenía obligatoriamente que salir por ahí o podía usar otro parking?

R. No, tenía otro acceso que era por la otra, la otra, la primera parte de la Universidad, que no necesariamente tenía que salir por esa.

*1011
P. ¿Ya donde más la transfirieron a usted, a qué otro sitio?

R. Después que estuve, estuve como dos meses en Finanzas, me fui para... me trasladaron para Terapia Ocupacional...

P. De Terapia Ocupacional, ¿ya usted no tenía que ver con, con Santos, no era, no la supervisaba a usted?

R. No, él ya no me supervisaba.

P. ¿Yen terapia ocupacional, cuánto tiempo estuvo?

R. Estuve como, aproximadamente de cuatro a cinco meses.

P. ¿Y de Terapia Ocupacional la cambiaron para dónde?

R. Para Recurso Humanos.

R. En Recurso Humanos estuve como, como dos meses.

P. ¿Y el señor Nelson Santos?

R. El se quedó en la oficina, sí.

P. ¿Él se quedó en la oficina? ¿Y cuándo, usted estuvo alguno, si alguno, algún otro incidente con él posteriormente ?

R. Sí, él siempre cuando me lo encontraba, él se me quedaba mirando o cuando, o cuando iba con mis compañeras, él iba también al mismo sitio donde almorzábamos.

P. ¿Pero hablaba con usted?

R. No. No hablaba conmigo.

P. ¿Dejó de hablar? ¿Luego de la querella, dejó de hablar con usted?

R. El no me, él no me hablaba, simplemente que se aparecía por donde yo estaba. Estaba como vigilando pendiente a todo lo que yo hacía.

P. ¿Cómo sus funciones normales, él tenía, él tenía que ir a enfermería a algo?

*1012
R. Que yo sepa, no.

P. No. ¿Lo llegó a usted a ver por allí, por enfermería?

R. Sí, lo llegue a ver. En una ocasión o dos ha llegado, después que yo, pues la...

P. O sea, que se aparecía, por los lugares que usted estaba, eso es lo que usted dice.

R. Sí.

P. Le pregunto, testigo, después que, usted dice que fue trasladada de su oficina allá para el, el mes de julio, o cuándo fue que fue trasladada de la primera, la primera vez de la oficina de usted, estaba cerca el señor Santos.

R En julio.

P. En julio. ¿ Y cuándo es la última vez que usted lo ve a él, que usted dice que iba por los lugares donde usted trabajaba?

R. Allá para octubre, casi ya antes de yo irme, terminar mi contrato en la Universidad.

P. ¿Para octubre del 2002?

R. Del 2003.

P. ¿Aúnpara octubre del 2003, qué el hacía?

R. Pues, se pasaba por donde yo estaba. Si yo salía para, para, para...

P. ¿Ya que distancia él se acercaba de donde usted estaba, cuando usted estaba allá en esas otras oficinas?

P. Un poquito más para atrás. Nueve pies.

R. Sí, porque era un pasillo.

P. ¿ Y cuando usted, y cuando usted caminaba para, para el carro, para alguna gestión, él se quedaba detenido o le seguía a usted?

R. El se quedaba, a veces seguía lento, o si no se paraba y se me quedaba mirando.

*1013
P. ¿Y cómo usted se sentía con ese comportamiento?

R. Temerosa, angustiada, nerviosa, perseguida, atemorizada.

P. Que usted sepa, si lo sabe, ¿ la Universidad le dio a él alguna directriz que no se acercara a usted?

R. Sí, tengo entendido que cuando una vezyo radiqué la querella el 9 de julio, a él se le dijo que no se me podía acercar para nada. Para nada se me podía acercar.

P. ¿ Usted dio alguna queja a alguien de que él se estaba yendo al área donde usted estaba trabajando?

R. Una vez lo documenté que fue un incidente en la cafetería, que ya yo había radicado mi querella y él viene y se me acerca directamente bien, bien pegado hacía mi, y yo tuve que coger y salirme, dejé hasta el pan yo creo que en la tostadora, que mi compañera Carmen Rivera estaba en la cafetería, que fue testigo de eso, y me llevó con ella. Y ella vio cuando esa persona, el señor Nelson Santos, pues, prácticamente, me persiguió en la cafetería.

P. ¿Y ese comportamiento no fue el último que usted tuvo con él?

R. No, luego, después de ese siguió. ” 

De otra parte, durante el contrainterrogatorio, Lebrón declaró que después de haber presentado la querella le notificó a la Directora Interina de Recursos Humanos de la UPRH sobre un incidente que ocurrió en la cafetería el 6 de agosto de 2002 en el que Santos se le acercó y la persiguió. En ese momento, la Directora le indicó que Santos tenía instrucciones de que no podía acercársele. También Lebrón declaró que después de noviembre de 2002 le comentó a la Directora que Santos continuaba persiguiéndola en el estacionamiento. 
A pesar de las gestiones que realizó la UPRH de reubicar a Lebrón a la Oficina de Finanzas para así alejarla de Santos, ello no fue suficiente, pues él continuó acosándola. Más aún, la UPRH reubicó a Lebrón en otros tres (3) departamentos por la necesidad del servicio; sin embargo, Santos continuó hostigándola hasta octubre de 2003.
Ciertamente, en este caso, el testimonio de Robles le mereció entera credibilidad al TPI, por lo que dicho foro no concluyó que la acción en daños estuviera prescrita.
Sabido es que, al apreciar la prueba ante su consideración, los tribunales apelativos no habrán de pasar juicio sobre la credibilidad de los testimonios ofrecidos ante el foro de instancia y sustituirlo por el criterio propio. Ello es así, porque el tribunal de instancia es el foro ante el cual declararon los testigos y el cual tuvo la oportunidad de apreciar el comportamiento, evaluar la veracidad del testimonio y dirimir cualquier conflicto que surgiera en el proceso, Pueblo v. Dávila Delgado, 143 D.P.R. 157, 173 (1997); López Vicil v. ITT Intermedia, 142 D.P.R. 857, 864-865 (1997).
Conforme a lo anterior, forzoso es colegir que no le asiste la razón la UPRH cuando dice que en este caso el término presciptivo para presentar la demanda comenzó a decursar a partir del 9 de julio de 2002. De conformidad con lo alegado en la demanda y el testimonio de Lebrón, el patrón de conducta antijurídica de Santos se extendió hasta octubre de 2003, por lo que no fue hasta ese momento en que cesó el ambiente hostil.
Siendo así, concluimos que la acción de Lebrón no estaba prescrita. Ésta presentó su demanda el 23 de *1014 septiembre de 2003, y los actos constitutivos de ambiente hostil se extendieron hasta octubre de 2003. Por ello, resolvemos que el tercer error no se cometió.
VI
En vista de que el cuarto y quinto error están estrechamente relacionados, los discutiremos en conjunto.
Como cuarto error, la UPRH indicó que el TPI erró al determinar que dicha institución había infringido las disposiciones de la Ley Núm. 115, pues Lebrón ostentaba un nombramiento temporero por lo que no tenía una expectativa de continuidad en el empleo.
En cuanto al quinto error, sostuvo que el TPI incidió en la apreciación de la prueba, debido a que no le dio credibilidad a las declaraciones de la Dra. Hilda Colón Plumey, Rectora de la UPRH. Sobre este asunto, argumentó que según su testimonio, Lebrón fue ubicada en distintas dependencias del recinto, tales como Terapia Ocupacional, Recursos Humanos y Enfermería, por razones estrictamente vinculadas con la necesidad del servicio. Que dichos cambios se hicieron conforme a la ley y que el hecho de no haber renovado el contrato de servicios de Lebrón en octubre de 2003, no fue por represalias.
Es importante aclarar que en su sentencia el TPI señaló que la controversia pendiente de adjudicarse en el caso se circunscribía a determinar si la no renovación del contrato de servicios de Lebrón por la UPRH en una cuarta ocasión constituyó un despido o fue en represalia por haber presentado la querella y la demanda por hostigamiento sexual.
De hecho, el Tribunal concluyó que en efecto la no renovación del contrato de Lebrón constituyó un despido por represalias por Lebrón haber presentado la querella y la demanda por hostigamiento sexual y no se debió, como declaró la Rectora de la UPRH, a que sus servicios ya no se justificaban al haber culminado la acreditación del Departamento de Enfermería.
No empece a lo anterior, en la parte dispositiva de la sentencia, el TPI dispuso que se declaraba “ha lugar” la demanda y que le concedía a Lebrón la cantidad de cuarenta mil ($40,000) mil dólares por todos las angustias mentales ocasionadas por la conducta hostigante de Santos.
Es un principio firmemente arraigado en los procedimientos apelativos que la revisión se da contra la parte dispositiva de la sentencia, no contra sus fundamentos. Pueblo v. Pérez Rodríguez, 159 DPR _, 2003 JTS 96, a la página 1114, Opinión de 23 de mayo de 2003. Esto es así debido a que en una sentencia los derechos de las partes son adjudicados en la referida parte dispositiva. A esos efectos, el Tribunal Supremo ha dicho que “[e]s sólo la porción o parte dispositiva de la 'sentencia' la que constituye la sentencia; los derechos de las partes son adjudicados, no mediante la relación de los hechos, sino únicamente mediante la parte dispositiva de la misma”. Cárdenas Maxán v. Rodríguez, 119 D.P.R. 642, 656-657 (1987).
A base de lo anterior, adviértase que en el caso de marras, el TPI adjudico las reclamaciones de Lebrón al amparo de la Ley Núm. 17, supra, y no de la Ley Núm. 115, supra.
Por otro lado, los empleados por contratos con términos fijos de duración eran clasificados por la anterior Ley de Personal del Servicio Público, 3 L.P.R.A. see. 1301 y ss., como empleados transitorios. Éstos sólo poseen expectativa de continuidad en el empleo durante el término fijo de su nombramiento, excepto cuando ciertas circunstancias originen unas expectativas más allá del término. Véase, García Meléndez v. Mun. de Arroyo, 140 D.P.R. 750, 754 (1996); Depto. Recs. Naturales v. Correa, 118 D.P.R. 689, 697 (1987). Una vez ha vencido el nombramiento, el empleado no posee expectativa de retención ni le asiste el derecho a que el mismo se le extienda constantemente, excepto que las circunstancias le creen expectativas de ser retenido. Depto. Recs. Naturales v. Correa, supra, a la página 699.
*1015 Una expectativa de continuidad, formulada unilateralmente por la persona sirviendo bajo contrato, aunque esté fundada en el hecho de que se le ha renovado el contrato de servicios profesionales por varios años, no es suficiente para crear una expectativa de continuidad que obligue a la Universidad. Dept. Recs. Naturales v. Correa, supra, a la página 699.
Aunque la Ley de Personal excluye expresamente a la Universidad de Puerto Rico de su aplicación, con la aprobación del Reglamento General Núm. 6479 (en adelante “el Reglamento”), según enmendado, la Universidad adoptó un mecanismo análogo a la Ley de Personal.
El nombramiento temporero contemplado en la Sección 30.1.5 del Reglamento, es similar a la figura del empleado transitorio estatuido en la Ley de Personal. El Reglamento dispone que este nombramiento se utiliza “para cubrir un cargo o puesto no regular, que se apruebe por un período fijo no mayor de doce (12) meses, para atender necesidades especiales del servicio, como lo son las alzas imprevistas y ocasionales en el volumen de trabajo. Este nombramiento no debe ser antesala de un nombramiento probatorio o permanente, a menos que éste se logre mediante el procedimiento regular que establece este Reglamento.”
También se dispone en la Sección 30.1.1, que el nombramiento permanente es aquél que “se otorga para cubrir un cargo o puesto regular aprobado en el presupuesto, después que el incumbente haya cumplido satisfactoriamente su período de trabajo probatorio. El incumbente gozará de todos los derechos y protecciones que establece este Reglamento. ”
El Reglamento provee, además, en la Sección 98.26, que el personal bajo contrato “rinde sus servicios a la Universidad sin ocupar una plaza, bajo un contrato de servicios que le asigna un conjunto de deberes y responsabilidades por un término fijo. ”
Las circunstancias en este caso no ameritaban que se aplicaran las disposiciones de la Ley Núm. 115, supra, pues no se podría reconocer una expectativa real a Lebrón de retención en el empleo, ya que ésta rendía sus servicios mediante contrato y no era una empleada regular. Además, la última renovación del contrato de Lebrón se extendía desde el 1ro. de junio de 2003 al 30 de octubre de 2003. Por consiguiente, previo a que ella presentara la demanda, o sea el 23 de septiembre de 2003, ya su contrato tenía fecha de terminación.
En virtud de lo anterior, concluimos que no se cometieron el cuarto y quinto error alegado.
VII
Por los fundamentos expuestos, confirmamos la sentencia apelada que le concedió a Lebrón cuarenta mil dólares ($40,000) por los daños sufridos como consecuencia de la conducta hostigante del co-demandando Santos y tres mil dólares ($3,000) por concepto de honorarios de abogado, más dos punto cinco por ciento (2.5%) de interés anual.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.
María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones
ESCOLIOS 2007 DTA 44
1. Las secciones antes mencionadas disponen lo siguiente:

“Sección 39.2.5-Interrupción, obstaculización o perturbación de las tareas y funciones regulares de la Universidad o de actividades legítimas de la institución que ocurran dentro o fuera de los terrenos universitarios.

*1016
Sección 39.2.8-Actos que bajo los cánones de responsabilidad moral prevalecientes en la Comunidad constituyen conducta inmoral.

Sección 39.2.19-Violaciones a la Ley de la Universidad, a las disposiciones de este Reglamento y demás reglamentos universitarios. ”

2. Véase el recurso de apelación a la nota al calce número 1.
3. Era el Director de Finanzas y supervisor de Santos.
4. Véase el Apéndice del recurso el “Informe Sobre el Proceso de Reubicación de la Sra. Nydia M. Lebrón Amaro” con fecha de 18 de octubre de 2002, a las páginas 54 y 55.
5. Véase la transcripción del juicio del 12 de abril de 2005, testimonio de Lebrón, a la página 28.
6. Previo a la vigencia de la Ley Núm. 17, supra, la jurisprudencia del Tribunal Supremo de Puerto Rico caracterizaba “el hostigamiento sexual [como] una modalidad del discrimen por razón de sexo proscrito por la Ley Núm. 100”. Rodríguez Meléndez v. Sup. Amigo, Inc., supra, a la página 124.
7. Véase la transcripción, testimonio del Dr. José R. Rodríguez Cay, a las páginas_.
8. Véase el Apéndice del recurso a la página 37.
9. Véase la transcripción de la vista, testimonio de la Dra. Hilda Plumey, a la página 42.
10. En la vista, Lebrón declaró que había comenzado a trabajar en la UPRH para mediados de febrero de 2001 como Secretaria de Cuentas por Cobrar en el Departamento de Finanzas por jornal. Luego en marzo de 2001 comenzó por contrato. Véase la transcripción de la vista, testimonio de Lebrón, a las páginas 4-5.
11. Véase la transcripción de la vista, testimonio de Lebrón, a las páginas 26-30, 32-33, 36-37.
12. Id., a las páginas 42-43.